**FILED**
DEC 0 7 2005
UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By _____ PD _____ Deput

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | Case No. J05-0009 CR (JWS) |
| ) | |
| vs. ) | |
| ) | |
| DAVID GLENN WAITS, ) | REPORT AND |
| ) | RECOMMENDATION ON |
| Defendant. ) | MOTION TO SUPPRESS |
| _____ ) | |

I. INTRODUCTION:

The defendant, David Glenn Waits, is charged with felon in possession of a firearm. He moves at docket 12 to suppress the firearm, arguing that it was the product of an illegal search of his room at the Narrows Inn in Petersburg. The government opposes the motion, arguing that police officers were given consent to enter the room by the defendant's roommate, Jesus Hernandez.

An evidentiary hearing was held on the defendant's motion on December 1, 2005. At that hearing, Petersburg Police Captain Bruce Westre and the defendant testified, and audio recordings of the police actions on the day in question were admitted into evidence. After considering the evidence presented at the evidentiary hearing, the arguments contained in the defendant's motion (docket 12) and memorandum (docket 14), the government's opposition (docket 19), including the cassette tape filed with it (attachment A to docket 19), and the

1

CD recording (exhibit A admitted in the December 1 hearing) as well as the arguments made by counsel at the December 1 hearing, I now make the following report and recommendation.

## II. FINDINGS OF FACT:

1. On October 4, 2005, the defendant David Glenn Waits resided in room 117 of the Narrows Inn, a motel in Petersburg, Alaska.

2. The defendant had rented the room since the beginning of September, 2005. The room was a standard hotel room consisting of a one room living area including a kitchen area, and an adjoining bathroom.

3. Approximately a month before the October 4 incident, Jesus Hernandez began living in the motel room with the defendant.

4. The defendant and Jesus Hernandez agreed that Mr. Hernandez could live there if Mr. Hernandez paid the defendant the extra $100 that the motel would charge to have an extra person stay in the room.

5. Mr. Hernandez never paid the defendant the agreed upon $100. However he continued to reside there. Mr. Hernandez kept his belongings in the room. He had a key to the room and a key to the defendant's post office box. The defendant was aware that Mr. Hernandez had these keys.

6. On the afternoon of October 4, Mr. Hernandez called the Petersburg Police Department to complain that the defendant had been drinking all night, that he was in possession of a loaded gun, and that Mr. Hernandez was

2

uncomfortable being in the room.

7. Captain Bruce Westre learned of this call from another officer when he reported for duty at 2:00 p.m. on October 4. Captain Westre and the other officer responded to the Narrows Inn. Mr. Hernandez was advised to wait outside the room until officers arrived.

8. Upon arriving, the officers met Mr. Hernandez in the parking lot of the Narrows Inn.

9. Mr. Hernandez told officers that the defendant was his roommate. Mr. Hernandez said the defendant is a really nice guy when he's sober, but the defendant had been drinking all night. Mr. Hernandez said that "a little while ago" they got in an argument, and the defendant grabbed his gun and loaded it and cocked it, and then went to sleep with the gun.

10. Mr. Hernandez said the defendant had not threatened him with the gun, but Mr. Hernandez felt threatened by the gun, and did not feel that he could lie down and go to sleep while the defendant had the gun in his hand.

11. The Narrows Inn is a U-shaped building. The door to room 117 opens onto the parking lot in the center of the "U". Although the room has a window opening onto the parking area, police were not able to see the defendant through the window.

12. After arriving at the Narrows Inn but before entering the room, the officers were informed by their dispatcher that the defendant had a felony

3

conviction from Juneau.

13. Because the information available to the officers indicated that there had been a domestic dispute involving a firearm and that there may be an intoxicated person in possession of a loaded firearm, the officers had reason to be concerned about the safety of the community as well as their own safety.

14. The officers asked Mr. Hernandez if they had his permission to enter the room and Mr. Hernandez responded by saying "yes". Mr. Hernandez identified the room and said the door was open. Although Captain Westre understood Mr. Hernandez to mean that the door was unlocked, the police found when they went to the door that it was ajar. They opened the door and entered the room.

13. Although Captain Westre believed Mr. Hernandez had a key to the room at that point, he was not able to recall whether Mr. Hernandez actually said he had a key. Captain Westre testified that it was his impression that Mr. Hernandez could have let them into the room if it had been locked.

14. If Mr. Hernandez had not granted permission to enter the room, the officers would have taken some other action to investigate the situation. Captain Westre testified that, in that case, he most likely would have done a "knock and talk" at the room. He might have applied for a search warrant for the room as well.

15. Upon entering the room, Captain Westre saw the defendant lying on a

4

mattress on the floor. Next to the mattress on the floor, within arm's reach of the defendant, was a rifle. The rifle was in plain view.

16. Captain Westre immediately walked over to the rifle and picked it up. He determined that it contained rounds in the magazine but none in the chamber.

17. Captain Westre testified that, at the time he made contact with the defendant in the hotel room, the defendant had an odor of alcohol, his speech was occasionally slurred, he had blurry eyes, and he exhibited an attitude consistent with a person who was intoxicated. He explained that the defendant's demeanor was a "roller coaster". There were empty alcohol bottles in the room. The defendant's balance seemed steady. Captain Westre testified that based on his training and experience as a law enforcement officer with approximately 27 years experience, he considered the defendant to be intoxicated.

18. The officers seized the weapon but they did not arrest the defendant. They advised Mr. Hernandez to make other living arrangements and to come back later for his personal effects.

19. At approximately 4:25 p.m. on October 4, the defendant came to the Petersburg Police Department asking to pick up the rifle. Captain Westre questioned whether he could give the gun to the defendant because the defendant might be intoxicated.

20. Captain Westre asked the defendant to submit to a breath alcohol test, to which the defendant agreed. The breath test indicated that the defendant had

5

a blood alcohol content of 0.188%, more than twice the legal limit for driving.

21. The defendant told Captain Westre that he had not consumed any alcohol since approximately noon.

22. Based on the signs of intoxication observed by Captain Westre at the Narrows Inn, the high breath alcohol reading obtained two or two and one half hours later, and the defendant's statement that he had not consumed any alcohol since officers were at the Narrows Inn, I find by a preponderance of the evidence that the defendant was under the influence of alcohol at the time officers seized the rifle at the Narrows Inn.

23. The defendant testified that he and Mr. Hernandez had argued because Mr. Hernandez had been using the defendant's belongings without permission. Among other things, Mr. Hernandez had taken the defendant's rifle without permission.

24. As a result, according to the defendant's testimony, he told Mr. Hernandez "take your stuff, you got to go." Mr. Hernandez responded that he would find someplace else to stay.

25. The defendant admitted that, at the time of this conversation, he had been drinking. He said after this discussion Mr. Hernandez left the room and the defendant got his gun and laid down to sleep.

26. Mr. Hernandez had his belongings in the room. The defendant testified that Mr. Hernandez had "a hell of a lot of stuff" in the room. Mr.

6

Hernandez did not take his things with him when he left following the argument. The defendant testified that he knew Mr. Hernandez would come back for his belongings.

27. The defendant testified that he and Mr. Hernandez had argued four days earlier, at which time the defendant also asked Mr. Hernandez to leave. Mr. Hernandez did not leave at that time, and the defendant did not insist on his departure.

28. Mr. Hernandez had a key to the hotel room and a key to the defendant's post office box. The defendant did not ask for those keys back on either occasion that he asked Mr. Hernandez to leave. The first time that the defendant asked for the keys from Mr. Hernandez was after the police arrived on October 4.

### III. CONCLUSIONS OF LAW:

#### A. Warrantless Search:

It is undisputed that the police entered the defendant's room at the Narrows Inn on October 4, 2005 without a warrant. It is further undisputed that the defendant's room at the Narrows Inn was his place of residence. A warrantless search of a residence is presumed to be unreasonable.[1] The Fourth Amendment prohibition of unreasonable searches also protects the legitimate expectation of

---

[1] *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Rambo*, 74 F.3d 948, 953 (9th Cir. 1996).

7

privacy of an occupant of a hotel or motel room.[2]

The government has the burden of showing that a warrantless search was reasonable under one of the narrow exceptions to the warrant requirement.[3] One of those recognized exceptions is consent by a person having control of the premises.[4]

The defendant argues that Jesus Hernandez did not consent to a search of his room at the Narrows Inn. The defendant further argues that even if Mr. Hernandez gave consent, he did not have actual or apparent authority to give consent, because the defendant had evicted Mr. Hernandez from the room before he gave consent. The defendant goes on to argue that that police should have obtained a warrant before seizing the gun. Finally, the defendant argues that as a result of the alleged illegal search or seizure his subsequent statements to the police should be suppressed as fruit of the poisonous tree.

B. Consent:

It is clear that Mr. Hernandez consented to the police entry into the room. He was specifically asked if he gave the police permission to enter and he

---

[2] *Bailey v. Newland*, 263 F.3d 1022, 1029 (9th Cir.2001); *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

[3] *United States v. Carbajal*, 954 F.2d 924, 930 (9th Cir. 1992).

[4] *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990).

8

answered affirmatively.[5] The government has met its burden of showing the existence of consent to enter the room.

The defendant argues, however, that Mr. Hernandez only gave permission to enter the apartment, but not to conduct a search. But the undisputed testimony of Captain Westre was that, once he entered the room, he was able to see the gun in plain view on the floor within reach of the defendant.[6] No search was necessary to locate the gun.

Before entering the apartment, the officers had been notified by their dispatcher that the defendant had a felony conviction. Accordingly, whether or not a State law crime was being committed, officers had probable cause to believe that a federal crime was being committed when the defendant possessed the gun.[7] If their initial entry into the room was lawful, the seizure of the gun seen in plain view in the defendant's possession was lawful.[8] Whether the entry was

---

[5] This question and answer can be heard on the CD recording, Exhibit A from the December 1 evidentiary hearing.

[6] Although the defendant contended in his memorandum that the gun was under a blanket, and that a search was necessary to locate it, no evidence was presented to support this contention.

[7] The defendant correctly noted in his memorandum that possession of a long gun by a felon is not a violation of Alaska law. At the evidentiary hearing, the defendant argued that there was not probable cause to believe that he committed the State crime of possession of a firearm while intoxicated because the Alaska statute, AS 11.61.210(a)(1), requires possession on one's person.

[8] Evidence in plain view may be seized without a warrant so long as the initial intrusion leading to the view is lawful and the incriminatory nature of the

9

lawful in turn depends on Mr. Hernandez' authority to give consent.

### C. Actual authority:

The United States Supreme Court held in *United States v. Matlock*[9] that valid consent to search may be given by a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. The *Matlock* court explained that common authority does not require a property interest in the premises:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[10]

In *Matlock*, police were given permission to search a house by a woman who answered the door in a bathrobe, holding her son in her arms. She lived in the house and slept in the bedroom where the search was conducted. The

---

evidence is immediately apparent to the officers. *Horton v. California*, 496 U.S. 128, 136-7, 110 S.Ct. 2301, 2308, 110 L.Ed.112 (1990); *United States v. Rousseau*, 257 F.3d 925, 929 (9th Cir. 2001). Since the officers knew the defendant was a felon, the incriminating nature of the gun was immediately apparent.

[9] 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

[10] *Id*; 415 U.S. at 171, n. 7.

10

Supreme Court concluded that as a co-occupant of the home she had authority to give consent to search, and reversed the trial court's suppression of evidence found in the search.[11]

The Supreme Court elaborated on the boundaries of the authority to give consent in *Illinois v. Rodriguez*.[12] That case involved a search consented to by a woman who formerly lived with the defendant, but who had moved out a month earlier. Since that time she occasionally spent the night, and some of her household effects remained in the home, but she never went there herself when the defendant was not home. Although she had a key to the home, she apparently took it without the defendant's knowledge. On those facts, the Supreme Court found that she "obviously" did not have common authority over the home.[13]

The defendant in this case testified that he and Mr. Hernandez had been sharing the hotel room for approximately a month. They had agreed that Mr. Hernandez would pay the defendant $100 per month to stay there (the amount the hotel charged for an extra person to reside in the room). Mr. Hernandez never paid the $100. Mr. Hernandez had a key to the room and a key to the defendant's post office box. Mr. Hernandez kept his household possessions in

---

[11] *Id.*

[12] 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

[13] 497 US. at 182.

11

the room. Mr. Hernandez slept in the bed, and the defendant slept in a mattress on the floor. Until October 4, the room was Mr. Hernandez' place of residence.

Leaving aside for the moment the question of whether Mr. Hernandez' right of occupancy had been terminated prior to the search, it is clear that Mr. Hernandez had the authority as a co-occupant of the room to search the room. The Tenth Circuit reached this conclusion on similar facts in *United States v. Kimoana*, 383 F.3d 1215 (10th Cir. 2004). In that case, a hotel room registered to the defendant was searched on the basis of consent granted by another individual staying in the room. In language which applies equally to this case, the court explained why the consent was valid:

> Although [the person in question] was not the registered guest who had paid for the room, he had stayed there overnight, left his possessions there, and carried a key to the room. This supports a finding that [the person] had joint access or control over the room, and thus had actual authority to consent.[14]

The defendant argues, however, that whatever authority Mr. Hernandez had as a co-occupant of the room terminated earlier on October 4 when they argued and the defendant told Mr. Hernandez he had to leave.

But the defendant's own testimony did not indicate that he intended by telling Mr. Hernandez this to immediately terminate Mr. Hernandez' occupancy. Rather, he told Mr. Hernandez that he would need to find another place to live. Several aspects of the discussion suggest that Mr. Hernandez continued to have

---

[14] *Id.* at 1222.

12

a right to use and occupy the room until he was able to find another place.

The defendant did not ask Mr. Hernandez to return his keys. He gave Mr. Hernandez no deadline. He said nothing to Mr. Hernandez about removing his personal effects. In fact, the defendant acknowledged that he expected Mr. Hernandez to return to the room to retrieve his belongings. The defendant suggested no other procedure for Mr. Hernandez to retrieve his belongings. The defendant gave no written notice to Mr. Hernandez, nor did he make contact with the hotel management to tell them that he would not have another person in the room anymore. Instead, the defendant went to sleep (or passed out).

Four days earlier, according to the defendant, he and Mr. Hernandez had an argument during which he told Mr. Hernandez to move out. The defendant took no action during those four days to enforce his purported eviction of Mr. Hernandez. If the police had not been called, and the defendant had woken up -- and sobered up -- later on October 4, there is no reason to believe he would have done anything more than he did four days earlier to actually terminate Mr. Hernandez' occupancy.

The most reasonable interpretation of the defendant's instructions to Mr. Hernandez is that he was directing Mr. Hernandez to find another place to stay, which implied that Mr. Hernandez could continue to stay at the hotel room until he did so. The preponderance of the evidence – primarily the defendant's own testimony – supports such an interpretation.

13

Much of the explanation for the ambiguity of the situation is likely a result of the defendant's state of intoxication when he argued with Mr. Hernandez on October 4. Perhaps if he had been sober, the defendant would have given more specific instructions to Mr. Hernandez to vacate the premises immediately, but by all indications he did not do so. One cannot attribute to the defendant the actions he might have taken had he been sober. There is no evidence suggesting that the defendant clearly, unequivocally, and immediately terminated Mr. Hernandez' right of use and occupancy.

As a matter of state law, the defendant could apparently have terminated Mr. Hernandez' right of occupancy without prior notice. As a lodger in the defendant's hotel room, Mr. Hernandez had whatever rights his oral rental agreement gave him, but he did not have the rights of a tenant under Alaska's Uniform Residential Landlord Tenant Act, AS 34.03.010 *et seq.*[15] But in light of the course of dealings between these two men, and the lack of specificity of the defendant's statement to Mr. Hernandez, I cannot find that Mr. Hernandez was immediately rendered a trespasser in the room where he had resided for a month as a result of the defendant's somewhat ambiguous statement.

By allowing Mr. Hernandez to stay in his hotel room, to carry a key, to keep

---

[15]Although there is no Alaska case on point, AS 34.03.360(21) defines a "tenant" as a person entitled to occupy a dwelling unit to the exclusion of others. Because Mr. Hernandez' right to use the hotel room was nonexclusive, he was apparently not a tenant entitled to the procedural protections of the Uniform Residential Landlord Tenant Act.

14

his belongings there, and to come and go as he pleased, the defendant assumed the risk that Mr. Hernandez might, for as long as he continued to reside there, allow unwanted persons – such as the police – into the room.

### C. Apparent Authority:

Even if Mr. Hernandez did not have actual authority to give consent, the government argues that he had apparent authority. The Supreme Court held in *Illinois v. Rodriguez* that a third-party consent search is valid if a reasonable police officer would believe that the person giving consent to enter had authority over the premises.[16]

The Ninth Circuit has adopted a three-part test for determining whether there is apparent authority:

> First, did the searching officer believe some untrue fact that was then used to assess the consent-giver's use and access to or control over the area searched? Second, was it under the circumstances objectively reasonable to believe that the fact was true? Finally, assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority?[17]

The "untrue fact", under the defendant's formulation of this test, would be that Mr. Hernandez still lived in the hotel room. There is little dispute that the first and third elements are met. Captain Westre unquestionably believed – based upon Mr. Hernandez' statement that he was the defendant's roommate – that he

---

[16] 497 U.S. 177, 188-89, 111 L.Ed.2d 148, 110 S.Ct. 2793 (1990).

[17] *United States v. Reid*, 226 F.3d 1020 (9th Cir. 2000).

15

lived in the hotel room. If that statement was true, then Mr. Hernandez unquestionably had authority to grant the officers entry. The question is whether it was objectively reasonable for the officers to believe Mr. Hernandez when he said he resided in the hotel room.[18]

Obviously the primary fact which caused the officers to believe that Mr. Hernandez lived in the room was that Mr. Hernandez said he lived there.[19] If there is reason to doubt a person's assertion that they live in the premises in question, officers may not blindly rely upon that assertion, but rather must inquire further:

> Even when the invitation [to search] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.[20]

The defendant argues that the officers should have disbelieved Mr. Hernandez' claim that he lived in the room. The defendant contends that, having reported to the officers that he had argued with the defendant and that the

---

[18] Of course this fact is only untrue if Mr. Hernandez did not live in the hotel room. If this fact is true, then Mr. Hernandez had actual authority, as discussed above. The court need only reach the issue of apparent authority if the fact of Mr. Hernandez' residence is found to be untrue, meaning he had no actual authority.

[19] The defendant argues that Mr. Hernandez did not say he lived there; he only said that he was the defendant's roommate. This is a distinction without a difference. The term "roommate" necessarily implies the existence of some sort of shared living arrangement.

[20] *Rodriguez*, 497 U.S. at 188, 110 S.Ct. at 2801.

16

defendant had a loaded gun, Mr. Hernandez' report should have been treated with disbelief.

There was, however, nothing about Mr. Hernandez' report to suggest to officers that it was being made for vindictive reasons. Mr. Hernandez did not necessarily accuse the defendant of a crime. Rather, he reported (in essence) that the defendant was asleep with a loaded weapon and that he was frightened of him. This gave the police no reason to believe that Mr. Hernandez' motive was to get the defendant in trouble.

Furthermore, even if Mr. Hernandez had accused the defendant of committing a crime of domestic violence, Mr. Hernandez would be entitled to more credibility, not less, as a victim of domestic violence.[21] There is no "domestic violence exception" to the usual rules allowing searches upon consent granted by a person having actual or apparent authority to give such consent.[22]

Moreover, there were facts corroborating Mr. Hernandez' claim to

---

[21] *United States v. McAlpine*, 919 F.2d 1461 (10th Cir. 1990). *See also*, *United States v. Mahler*, 442 F.2d 1172, 1174 (9th Cir. 1971)("Nor, when the informant is the victim of the crime, need it be shown by other facts that she is a reliable informant."); *United States v. Armstrong*, 654 F.2d 1328, 1335 (9th Cir. 1981)("Hearsay statements from victims are considered reliable."); *Fuller v. M.G.Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991)("where the citizen informant is the victim of the crime in question, the report is entitled to even greater weight."); *United States v. Johnson*, 713 F.2d 654, 660 (11th Cir. 1983)("There is no need to establish the reliability of information received from the victim of a crime").

[22] *See, e.g., State v. Bartram*, 925 S.W.2d 227 (Tenn. 1996)(overruling the so-called "angry wife" exception to consent searches); *United States v. Trzaska*, 859 F.2d 1118 (2d Cir. 1988)(estranged wife had authority to consent).

17

residency. Mr. Hernandez had a key to both the room and the defendant's post office box,[23] and Mr. Hernandez was already at the Narrows Inn when officers arrived, and he was able to identify the defendant's room and tell officers correctly that the door to the room was open.

And even if the officers had a duty of inquiry, that inquiry could only have brought to officers' attention other facts further corroborating Mr. Hernandez' claim of residency. For example, interviewing neighbors or hotel staff may well have confirmed what the defendant testified to at the evidentiary hearing -- that Mr. Hernandez had shared the room with the defendant for a month or so. Hotel staff might have confirmed that Mr. Hernandez' belongings were in the room.

Defendant points to no fact which would have been uncovered through further inquiry which would have called Mr. Hernandez' claim of residency into doubt. Instead, further inquiry would have strengthened Mr. Hernandez' claim of common authority over the room.

Faced with information suggesting that the motel room contained a person who may have been intoxicated and in possession of a firearm, the officers were

---

[23] It is not entirely clear whether the officers knew that Mr. Hernandez had a key. Captain Westre testified that he believed Mr. Hernandez was able to get in the room, but he did not recall whether there was discussion of a key. If, however, the defendant is correct that the officers should have made further inquiries, such inquiries would have made clear that Mr. Hernandez possessed of a key.

18

not required to disbelieve Mr. Hernandez when he said he lived in the apartment and gave them permission to enter. The officers acted reasonably in relying upon the consent given by Mr. Hernandez. If Mr. Hernandez did not have actual authority, he had apparent authority. I cannot conclude, therefore, that the officers' entry into the room was unlawful.

IV. RECOMMENDATION:

For the reasons set forth above I conclude that the officers' entry into the defendant's room was supported by consent given by a person having either actual or apparent authority. Accordingly, I recommend that the defendant's motion to suppress be DENIED.

Objections to this report and recommendation should be directed to the assigned District Judge.

DATED this 7th day of December, 2005 at Juneau, Alaska.

Philip M. Pallenberg
United States Magistrate Judge

Pursuant to Local Magistrate Rule 6, a party seeking to object to this proposed finding or recommendation shall file written objections with the Clerk of the U.S. District Court no later than the close of business **MONDAY, DECEMBER 13, 2005**. Response to any objection shall be filed no later than the close of business on **THURSDAY, DECEMBER 15, 2005**. The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waive the right to contest those findings on appeal. See, McCall v. Andrus, 628

19

F.2d 1185, 1187-89 (9th Cir. 1980), *cert. denied, McCall v. Watt,* 450 U.S. 996 (1981). No response to the objections will be allowed. Objections shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. The parties shall otherwise comply with the provisions of Local Magistrate Rule 6.

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the district court's judgment. *See, Hilliard v. Kincheloe,* 796 F.2d 308 (9th Cir. 1986).

PD Faxed to Counsel 12-7-05

```
J05-0009--CR (JWS)
------------------------------------------------
M. DIENI (FPD)
D. NESBETT (AUSA)
JUDGE SEDWICK
```

20.